**Michigan Supreme Court**
**Lansing, Michigan**

# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v THORPE
PEOPLE v HARBISON

Docket Nos. 156777 and 157404. Argued on application for leave to appeal April 11, 2019. Decided July 11, 2019.

In Docket No. 156777, Joshua L. Thorpe was convicted following a jury trial in the Allegan Circuit Court, Margaret Zuzich Bakker, J., of three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a). At trial, the jury heard testimony from Thomas Cottrell, the prosecution's expert witness who was qualified as an expert in the area of child sexual abuse and disclosure. Cottrell neither examined the alleged child victim nor was provided specific information about the case; rather, Cottrell was called to offer an expert opinion based on his education, experience, and long-term involvement with children and child sexual abuse. Cottrell testified to the broad range of reactions of children who are abused, the cost/benefit analysis children make in deciding whether to disclose abuse, and some of the reasons children may delay disclosure. The prosecution asked Cottrell to provide a percentage of the number of children who lie about sexual abuse. Defense counsel objected, but the court overruled the objection. Cottrell then testified that children only lie about sexual abuse 2% to 4% of the time. The jury convicted Thorpe. Thorpe appealed, and the Court of Appeals, HOEKSTRA, P.J., and MURPHY and K. F. KELLY, JJ., affirmed the convictions in an unpublished per curiam opinion issued on August 10, 2017 (Docket No. 332694). Thorpe moved for reconsideration, which the Court of Appeals denied. Thorpe then sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 503 Mich 869 (2018).

In Docket No. 157404, Brandon J. Harbison was convicted following a jury trial in the Allegan Circuit Court, Kevin W. Cronin, J., of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b); attempted CSC-I, MCL 750.520b(1)(b); two counts of CSC-II, MCL 750.520c(1)(a); and one count of accosting a child aged less than 16 years old for immoral purposes, MCL 750.145a. At trial, the prosecution presented testimony from Dr. N. Debra Simms, a pediatrician and an expert in the field of child sexual abuse diagnostics. Dr. Simms examined the alleged child victim, noted nonspecific findings, cited a pediatrics journal article, and diagnosed the child with "probable pediatric sexual abuse." The jury convicted Harbison. Harbison filed an appeal as of right and a motion to remand for an evidentiary hearing. The Court of Appeals, while retaining jurisdiction, granted the motion to remand. Following the hearing, the trial court granted a new trial. However, the Court of Appeals, MURPHY, P.J., and

METER, J. (RONAYNE KRAUSE, J., concurring in the result), reversed the trial court's grant of a new trial and affirmed Harbison's convictions in an unpublished per curiam opinion issued on January 26, 2017 (Docket No. 326105). Harbison sought leave to appeal in the Supreme Court, and the Supreme Court, in lieu of granting leave to appeal, vacated the part of the Court of Appeals judgment concerning the testimony of Dr. Simms and remanded the case to the Court of Appeals for reconsideration in light of *People v Peterson*, 450 Mich 349 (1995). 501 Mich 897 (2017). On remand, in an unpublished per curiam opinion issued on January 23, 2018, the Court of Appeals, MURPHY, P.J., and METER and RONAYNE KRAUSE, JJ., again affirmed Harbison's convictions, holding that it could not find a clear error with regard to Dr. Simms's testimony. Harbison again sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 501 Mich 1074 (2018).

In a unanimous opinion by Justice ZAHRA, the Supreme Court, in lieu of granting leave to appeal, *held*:

Expert witnesses may not testify that children overwhelmingly do not lie when reporting sexual abuse because such testimony improperly vouches for the complainant's veracity, and examining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury.

1. Preserved, nonconstitutional errors are subject to harmless-error review under MCL 769.26, which states that no judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. If the issue is preserved, then the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error. If the issue is not preserved, then the defendant must show a plain error that affected substantial rights. In Docket No. 156777, defense counsel's objection to Cottrell's expert testimony that children only lie about sexual abuse 2% to 4% of the time was sufficient to preserve Thorpe's nonconstitutional claim that Cottrell's testimony should not have been admitted. Defense counsel did not open the door to Cottrell's testimony regarding the rate of false reports in child sexual abuse cases simply by asking him on cross-examination whether children lie or manipulate. Accordingly, Thorpe's claim was preserved, and Thorpe had the burden of establishing a miscarriage of justice under a "more probable than not" standard to establish error requiring reversal. In Docket No. 157404, defense counsel did not object to Dr. Simms's expert testimony that the child suffered "probable pediatric sexual abuse." Accordingly, Harbison's claim was reviewed under the plain-error standard.

2. In *People v Smith*, 425 Mich 98 (1986), the Supreme Court held that an examining physician, if qualified by experience and training relative to treatment of sexual assault complainants, can opine with respect to whether a complainant had been sexually assaulted when the opinion is based on physical findings and the complainant's medical history. Four years

later, the lead opinion in *People v Beckley*, 434 Mich 691 (1990) (opinion by BRICKLEY, J.), observed that evidence of behavioral patterns of sexually abused children may be admissible for the narrow purpose of rebutting an inference that a complainant's postincident behavior was inconsistent with that of an actual victim of sexual abuse, incest, or rape. Five years later, in *People v Peterson*, 450 Mich 349 (1995), the Supreme Court found a majority to clarify the plurality decision in *Beckley* and held that an expert may testify in the prosecution's case-in-chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim. *Peterson* further held that an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility. However, the Supreme Court held that the experts in *Peterson* improperly vouched for the veracity of the child victim by testifying that children lie about sexual abuse at a rate of about 2%. Applying that framework, in Docket No. 156777, not only did Cottrell opine that only 2% to 4% of children lie about sexual abuse, but he also identified only two specific scenarios in his experience when children might lie, neither of which applied in this case. As a result, although he did not actually say it, one could reasonably conclude on the basis of Cottrell's testimony that there was a 0% chance the child had lied about sexual abuse. Furthermore, the prosecution's closing argument on rebuttal highlighted this improper evidence at a pivotal juncture at trial. Thorpe's trial was a true credibility contest because there was no physical evidence, there were no witnesses to the alleged assaults, and there were no inculpatory statements. Because the trial turned on the jury's assessment of the child's credibility, the improperly admitted testimony wherein Cottrell vouched for the child's credibility likely affected the jury's ultimate decision. Under these circumstances, Thorpe showed that it was more probable than not that a different outcome would have resulted without the expert's improper testimony. In Docket No. 157404, Dr. Simms's opinion that the child suffered "probable pediatric sexual abuse" was contrary to the Supreme Court's unanimous decision in *Smith*. Dr. Simms candidly acknowledged that her examination of the child showed no physical evidence of an assault; her conclusion that the child suffered "probable pediatric sexual abuse" was based solely on her own opinion that the child's account of the assaults was "clear, consistent, detailed and descriptive." That testimony fell within *Smith*'s holding that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the conclusion is nothing more than the doctor's opinion that the victim had told the truth. Furthermore, this error was plain. The decision in *Smith* was unanimous and has never been called into question. The test in *Smith* is a very straightforward bright-line test that trial courts can readily observe, and other than in this case, every other Court of Appeals panel that has considered an examining physician's diagnosis of "probable pediatric sexual abuse" has acknowledged that the admission of this testimony is error. Finally, Dr. Simms's testimony that the child suffered "probable pediatric sexual abuse" affected defendant's substantial rights. Regardless of whether "probable pediatric sexual abuse" is a term of art that can be used as a diagnosis with or without physical findings, Dr. Simms's testimony had the clear effect of improperly vouching for the child's credibility. Harbison's case was also largely a credibility contest with the only evidence against Harbison being the child's uncorroborated testimony; accordingly, given the lack of compelling testimony that formed the basis for the verdict and the plainly erroneous testimony that the child suffered "probable pediatric sexual abuse," the plain error affected Harbison's substantial rights. This error also invaded the province of the jury to determine the only issue in the case, and Dr. Simms reinforced this plain error by claiming that her diagnosis was based on a "national [consensus]" of pediatricians when even a cursory review

of the pediatrics journal article on which she relied revealed that the authors did not intend for pediatricians to rely on the article to make a diagnosis of "probable pediatric sexual abuse" at trial. This improperly admitted testimony very likely bolstered the child's credibility and affected the verdict and integrity of Harbison's trial.

Docket No. 156777 reversed and remanded to the Allegan Circuit Court for a new trial; Docket No. 157404 reversed and remanded to the Allegan Circuit Court for a new trial.

©2019 State of Michigan

# OPINION

Chief Justice:
  Bridget M. McCormack

Chief Justice Pro Tem:
  David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 11, 2019

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                No. 156777

JOSHUA LEE THORPE,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                No. 157404

BRANDON JAMES HARBISON,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

ZAHRA, J.

In these consolidated cases, we address the propriety and scope of expert testimony in cases alleging child sexual abuse. In *Thorpe*, we address the admissibility of testimony from an expert in the area of child sexual abuse and disclosure about the rate of false reports of sexual abuse by children to rebut testimony elicited on cross-examination that children can lie and manipulate. In *Harbison*, we address the admissibility of expert testimony from an examining physician that "diagnosed" the complainant with "probable pediatric sexual abuse" despite not having made any physical findings of sexual abuse to support that conclusion. In *Thorpe*, we hold that expert witnesses may not testify that children overwhelmingly do not lie when reporting sexual abuse because such testimony improperly vouches for the complainant's veracity. And because Thorpe has established that this testimony more likely than not affected the outcome of the case, we reverse the judgment of the Court of Appeals and remand to the Allegan Circuit Court for a new trial. In *Harbison*, we hold that examining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury. Because we conclude that this error was plain, affected Harbison's substantial rights, and seriously affected the integrity of his trial, we reverse the judgment of the Court of Appeals and remand to the Allegan Circuit Court for a new trial.[1]

---

[1] Given our disposition of these cases, we need not reach the remaining issues raised in defendants' applications.

2

# I. *PEOPLE v THORPE*

In 2006, defendant Joshua Thorpe began a relationship with Chelsie. She had a three-year-old daughter, BG, from a previous relationship. BG viewed Thorpe as a father figure and would refer to him as "dad."

In August 2007, Thorpe and Chelsie had a daughter together. For the next few years, Thorpe and Chelsie raised both girls with each parent working outside the home and sharing responsibilities for watching the children. In 2008, Thorpe's mother, Kimberly, helped take care of both girls after Chelsie went back to school. Kimberly also ran a daycare, and she had a daughter of her own, AS (Thorpe's half-sister), who was close in age and good friends with BG.

In 2010, Thorpe and Chelsie ended their relationship, but Thorpe continued parenting both BG and his daughter. The girls also continued attending the daycare run by Kimberly. Thorpe moved into a new residence down the street from his mother and within walking distance of the girls' elementary school. Although there was no formal custody agreement, Thorpe took care of the girls three days a week when he was not working (Saturday afternoon through Tuesday morning).

In 2012, Chelsie completed her schooling and entered into a relationship with a new boyfriend. Chelsie considered moving to Kalamazoo with him. This caused some conflict between Chelsie and Thorpe. For instance, on July 4, 2012, Chelsie took both girls to see fireworks with her new boyfriend but without Thorpe. According to Thorpe, this led to an argument between Chelsie and Thorpe. Additionally, Thorpe claims that he did not have any parenting time with the girls for the rest of the summer. Thorpe asserts that he did not see either of the girls until August 27, 2012, when he took his daughter out for her birthday.

3

Thorpe claims that on that day he told Chelsie that he no longer wanted to have parenting time with BG. According to Kimberly, she had advised Thorpe that he should focus on his biological daughter.

Chelsie became pregnant around this same time. Kimberly—who continued watching over BG and Thorpe's daughter at daycare—began to notice that BG had tantrums and outbursts, including when BG would leave the daycare to go home with her mom. Sometime in the fall of 2012, Chelsie arranged for six weeks of counseling sessions for BG. According to Chelsie, she speculated at the time that BG was upset about her pregnancy.

Thorpe stopped seeing BG altogether in late September or early October 2012, but there are conflicting accounts about who made this decision. Thorpe and Kimberly contend that it was Thorpe's decision. According to both Chelsie and BG, however, it was BG who decided that she no longer wanted to visit Thorpe. At that time, BG did not report any inappropriate touching by Thorpe. Kimberly continued to care for both girls, and she occasionally saw BG around Thorpe when he would pick up his daughter from daycare. According to Kimberly, she never got the sense that BG was repulsed by or afraid of Thorpe.

In April 2013, BG told AS (Kimberly's daughter and Thorpe's half-sister) that Thorpe had touched her inappropriately months earlier. AS reported this information to Kimberly. Kimberly talked with BG, who allegedly informed her of a single incident of inappropriate contact. Kimberly, in turn, informed Chelsie. According to Kimberly, she did not believe the allegation, but she believed that she had a duty to communicate the allegation to Chelsie. Chelsie then notified the authorities. When questioned by

4

authorities, BG reported that Thorpe had touched her inappropriately on multiple occassions.  The prosecution charged Thorpe with three counts of second-degree criminal sexual conduct (CSC-II).[2]

At trial, BG testified that Thorpe sexually assaulted her three separate times on two dates in August 2012 when she and Thorpe's daughter had stayed the night at Thorpe's residence.  According to BG, the first two incidents occurred while she was watching *Dora the Explorer* in the same bed as Thorpe's daughter, who had fallen asleep.  Thorpe entered the room, laid down next to BG, and rubbed her vagina with his hand under her pajamas but over her underwear.[3]  The second incident occurred several minutes later when Thorpe again repeated the same behavior.  Neither incident involved penetration.  Both times BG told Thorpe to stop, and he did.  BG testified that her dog, Jake, was in the room during both incidents.[4]  The next morning Thorpe told her not to tell anyone about the two incidents.[5]

The third incident occurred about a week later when BG again stayed at Thorpe's residence with his daughter.  According to BG, Thorpe entered the room while his daughter was sleeping, pulled BG's wrist behind her body, and placed her hand on his unclothed

---

[2] MCL 750.520c(1)(a) (victim under the age of 13).

[3] BG did not previously mention the act of rubbing to authorities.  During the preliminary examination, she asserted that Thorpe touched her under her pajamas and under her underwear.

[4] Although an offer of proof was not made at trial, Kimberly asserts that she would have testified that the dog had died several months earlier around Christmas 2011.

[5] During the preliminary examination, BG asserted that Thorpe did not say anything the next morning.

penis. BG asserted that she tried to pull her arm away and kicked his leg. Thorpe let go of her wrist at that point.

During the trial, the jury heard testimony from Chelsie, BG, Kimberly, Thorpe, and an investigator who interviewed BG. The jury also heard testimony from the prosecutor's expert witness, Thomas Cottrell. Cottrell, who has a master's degree in social work and is the vice president of counseling services at the YWCA Counseling Center, was qualified as an expert in the area of child sexual abuse and disclosure. Cottrell neither examined BG nor was provided specific information about the case. The prosecutor called him to offer an expert opinion based on his education, experience, and long-term involvement with children and child sexual abuse. Cottrell testified to the broad range of reactions of children who are abused, the cost/benefit analysis children make in deciding whether to disclose abuse, and some of the reasons children may delay disclosure.

On cross-examination, the following exchange took place between defense counsel and Cottrell:

> *Q*. And that goes along with—well, let me ask you this, kids can lie, true?
>
> *A*. Anyone who has ever worked with a child or has had a child knows that they can lie, yes.
>
> *Q*. And they can manipulate.
>
> *A*. They can do that, yes.

On redirect, the following exchange took place:

> *Q*. In your training and experience of all of the times that you've handled child sexual abuse cases, what, in your experience, if you can say, is the percentage of children who actually do lie?
>
> *A*. About the sexual assault itself?

6

*Q.* About the sexual assault itself.

Defense counsel objected at this point and asked if there were statistics to support Cottrell's anticipated answer. The trial court ultimately overruled the objection by concluding that defense counsel had brought up the issue of children lying on cross-examination and, thus, opened the door to the prosecutor's line of questioning on redirect.

Cottrell proceeded to answer the prosecutor's last question as follows:

> *A.* Yes. I can only speak to our experience at the organization. There is literature out there that is extremely variable in its—in it's [sic] identification of fabricated disclosures. I can tell you within our population, we run into it probably two to four percent of the cases that we get hav[ing] children alleging abuse when—sexual abuse when abuse did not actually occur. But I will say that in those cases, there is clear motivation for them to do that. When children lie, they lie with a purpose. They are usually trying to get something positive to happen to them or escape some kind of pain. . . . The whole process of investigating and being questioned and being brought into therapy are not pleasant experiences for children by any stretch of the imagination. So lying to bring that on to them is a relatively rare occurrence because there is no gain for children in having the spotlight put on them.

Cottrell then identified two scenarios in which children are likely to lie about sexual abuse: (1) when there is an abused sibling and the other child wants to be a part of whatever the sibling is doing, including therapy, and (2) when there is domestic violence against the other parent and the child lies about sexual abuse in order to bring attention to that situation.

The prosecutor again questioned:

> *Q.* In your experience, you said it's rare; is that correct?
>
> *A.* And it's extremely rare.
>
> On re-cross, defense counsel proceeded with the following line of questioning:
>
> *Q.* These percentages are when it's discovered, when it's figured out, fair?

7

*A*. Correct. Yes.

*Q*. It's very possible that there are other cases out there that were fabricated and false that were never discovered.

*A*. Well, we don't know what we don't know, obviously.

Before jury deliberations, the trial court provided the jury with the following instruction regarding Cottrell's testimony:

You have heard Thomas Cottrell's opinion about the behavior of sexually abused children.

You should consider that evidence only for the limited purpose of deciding whether [BG]'s acts and words after the alleged crime were consistent with those of sexually abused children.

That evidence cannot be used to show that the crime charged here was committed or that the defendant committed it. Nor can it be considered an opinion by Thomas Cottrell that [BG] is telling the truth.

The jury convicted Thorpe as charged. The trial court sentenced him to concurrent prison terms of 71 months to 15 years of imprisonment for each count. Because BG was under 13 years old and Thorpe was over 17 years old, Thorpe was also sentenced to lifetime electronic monitoring under MCL 750.520n(1). A judgment of sentence was entered on March 22, 2016.

With the assistance of appointed appellate counsel, Thorpe appealed of right. The Court of Appeals affirmed the convictions in an unpublished per curiam opinion, finding no error warranting reversal.[6] Thorpe moved for reconsideration, which the Court of Appeals denied.

---

[6] *People v Thorpe*, unpublished per curiam opinion of the Court of Appeals, issued August 10, 2017 (Docket No. 332694).

8

Thorpe sought leave to appeal in this Court. We directed the Clerk of this Court to schedule oral argument on whether to grant the application or take other action, ordering the parties to address the following issues: "(1) whether the trial court abused its discretion by allowing expert testimony on redirect about the rate of false reports of sexual abuse by children, see [*People v Peterson*[7]], in order to rebut testimony elicited on cross examination that children can lie and manipulate; and, if so, (2) whether the error was harmless."[8]

## II. *PEOPLE v HARBISON*

Beginning in January 2010, nearly 18-year-old defendant Brandon Harbison would occasionally babysit his nearly 9-year-old niece, TH. He did so through December 2012, around which time TH was removed from her home and placed in foster care. The prosecution characterized TH's childhood as "a life of turmoil" with a seriously drug-addicted mother and a dysfunctional home.

While watching a movie with her foster-care mother about a family struggling to stay together, TH "out of nowhere" started sobbing and began to describe "really bad" things that Harbison had done to her. The foster mother stopped her and called their caseworker before TH could give any details. After TH disclosed instances of sexual abuse to the authorities and a pediatrician, the prosecution charged Harbison with two counts of

---

[7] *People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995).

[8] *People v Thorpe*, 503 Mich 869, 869 (2018).

9

first-degree criminal sexual conduct (CSC-I),[9] attempted CSC-I,[10] two counts of CSC-II,[11] and one count of accosting a child aged less than 16 years old for immoral purposes.[12]

At trial, TH testified that Harbison touched her in inappropriate places, including her vagina, sometimes with his hand and sometimes with his mouth. This first happened at her grandmother's house and then at her mother's house. She testified that at her grandmother's house, her older brother was also in the room but that she and Harbison were alone at her mother's house. TH described Harbison performing oral sex on her "[t]oo many times to remember," masturbating and ejaculating onto her backside, making her watch pornography, and attempting vaginal and anal penetration. TH also testified that Harbison would put his private part in her mouth and that this happened "[a] lot." On cross-examination by defense counsel, TH estimated that Harbison had sexually abused her on more than 30 occasions. The last time one of these incidents occurred, Harbison told her that it was going to stop because he and his girlfriend were having a little girl.

TH's biological mother testified that Harbison, who was her brother, lived with her and her children for a time and also babysat for her. She testified that she was using methamphetamine at the time and that he was too. After she read the police report in this matter, she asked TH if it was true, and TH said "yes."

---

[9] MCL 750.520b(1)(b) (fellatio with a victim less than 13 and cunnilingus with a victim less than 13).

[10] MCL 750.520b(1)(b) (attempted anal penetration of a victim less than 13).

[11] MCL 750.520c(1)(a) (sexual contact with a victim less than 13).

[12] MCL 750.145a.

10

The prosecution presented testimony from Dr. N. Debra Simms, a pediatrician and an expert in the field of child sexual abuse diagnostics, in its case-in-chief. Dr. Simms examined TH and diagnosed her with "probable pediatric sexual abuse."

Dr. Simms testified:

> *Q.* So all that information that you described all came from [TH].
>
> *A.* Well it came from [TH] and sometimes from the foster mom.
>
> *Q.* The information that you said that [TH] told you that she was touched by [Harbison], that he—all of that information that you just recently described, that was all from [TH]?
>
> *A.* Yes ma'am, that was in my taking a history from [TH] prior to the physical examination.
>
> * * *
>
> *Q.* What did your physical examination consist of after you got the original history from [TH]?
>
> *A.* My physical exam included a head to toe generalized physical examination. It included looking at all of the parts of her body, doing the vital signs, and then it included using the culpascope and looking at the genital and anal area.
>
> *Q.* Okay. And based upon what [TH] had told you, would you have expected to find any injury or anything—any physical findings as a result of your exam?
>
> *A.* No. When she described the genital to genital contact and I asked about any symptoms or sensation during that, she described that it felt uncomfortable but she did not allege any bleeding.
>
> *Q.* Okay.
>
> *A.* Without a history of bleeding it is unlikely that we will see any kind of scarring, although scarring is unusual to this area, but I did not expect to see any findings of healed trauma without that history.
>
> *Q.* And did you find any physical findings?

*A.* Well she has normal female genital anatomy. The structures looked normal. In looking at her hymenal tissues she was what we call sexual maturity rating 3, so you're born at 1 and she was progressing puberty wise along a stage of development. She had not yet started her periods and she had enough sexual maturity that that could have happen [sic] at any time. In looking at the hymenal tissues they showed what we call an estrogenized effect, so you could see that she had gone—started going through puberty and had pubertal changes. At the 5:00 position on the hymen there was a very small notch, that's a non-specific finding. So in total her physical exam did not show any acute or remote indications of trauma, just the notch which is a non-specific exam.

*Q.* And what's a non-specific finding? What does that mean?

*A.* A non-specific finding is a finding that we can see for many different reasons and is not specific to any type of trauma to the genital tissues. You can have small notches that occur from events like time events such as the bicycle accident or something of that nature. You can get small notches from children that use tampons. You can get small notches that are actually developmental in nature. So when you have a very shallow very small notch that is less than 50% of the width of the hymenal rim, those are considered non-specific findings.

\* \* \*

*Q.* Did you have a diagnosis based on your exam and history?

*A.* Yes, ma'am.

*Q.* What was that?

*A.* Probable pediatric sexual abuse.

*Q.* And you said that even if there was no other than what you described [sic], her physical exam was normal?

*A.* Yes, ma'am.

*Q.* Was her normal physical exam inconsistent with her description of the sexual penetrations that she suffered?

*A.* No, ma'am. Her disclosure was that there had been contact by— contact by her uncle's mouth to her genital area. You would not expect residual of trauma from that. There was contact by her mouth to his penis, once again you wouldn't expect any kind of physical examination finding

12

from that. She described that there was touching. Children, we diaper them, we change them, we bathe them, we touch them all the time. To examine these children I have to touch them. I have to spread apart these layers and I don't cause any trauma. And then she described genital to genital contact which did not have any bleeding associated with it. So the fact that her physical examination shows non-specific findings with this notch and generally normal genital structures does not negate her history of what occurred to her body.

*Q*. How many attempted penile/anal or genital contact[s] [do not] leave any marks on the body? Do you have a percentage?

*A*. I personally have had lots of experience in which there has been genital to genital contact and in which there is a normal or a non-specific exam. In our published literature there is a paper, the title of it it's normal to be normal [sic], they took 236 children in which there was a substantiation or conviction in which there was a higher standard than just we think that these children may be abused and so they looked at these 236 children and of those 236 children more than two-thirds of girls with substantiated abuse had normal or non-specific findings. So it's normal to be normal. When you talk about what the nature of child sexual abuse is the majority of time it's licking, kissing, touching, rubbing, and we would not expect to see scarring or residual trauma from those events.

The trial court also questioned Dr. Simms:

*Q*. Alright. You described your conclusion as probable pediatric sexual abuse.

*A*. Yes, sir.

*Q*. Would you explain to the jury why you consider probable as opposed to maybe possible?

*A*. In an attempt to allow pediatricians that do child abuse evaluations to communicate with one another effectively, what I may look at and say this is concerning, and someone else may say it's suspicious, and someone else may say it's this or it's that, what happened is there became a national cocensus [sic] that we need to look at all of the evaluations and we need to be on the same page. We need to look at how is it that we are evaluating these patients and how are we coming to a conclusion. And, what occurred is that instead of using various and sundry words to describe the outcomes of these evaluations, an attempt was made to standardize this by saying if there is no disclosure of abuse and it is a normal exam with no concerning

13

situations, this means that there are no medical indications of abuse at this time, and that is a negative evaluation. If—other criteria exists [sic] but it's what we would consider a lower form of history. As a pediatrician I cannot always diagnose based solely upon the medical testing such as you referenced or from seeing something on the physical examination. If you come in to see me and you have a headache, I cannot see your headache, but based upon your history of where you tell me it hurts, when it hurts, how it hurts, how it feels, when it comes, when it goes, how often it comes, taking a comprehensive history, I can diagnose stress headache, cluster headache, migraine headache, etcetera, based upon the history. So in child sexual abuse we take the history that the child gives us and based upon how clear, consistent, detailed or descriptive it may be, if that is present with or without physical examination findings, that is probable pediatric sexual abuse. If the child makes a statement but the statement is limited because the child may have a developmental disability, they may be young, they may not be able to really tell me what has happened to their body, then that can be possible pediatric sexual abuse. They're making a statement but for some reason they're not able to be clear, consistent, detailed and descriptive like with the headache analogy. To get a diagnosis of definite pediatric sexual abuse we have very high tough standards. You have to be pregnant, you have to have a sexually transmitted disease that does not come from anything other than direct sexual contact. There has to be a video, a picture or an eyewitness to you being abused. Or, you have to have physical examination findings that have no other explanation than penetrating trauma to the intervaginal area. That's a really tough standard. So that's our definite. Then clear, consistent, detailed and descriptive history is probable, and then we have the other 2 categories for less than that.

*Q*. You refer to a ["we"] have this standard. Who is the ["we"]?

*A*. The ["we"] are the individuals that do pediatric sexual abuse evaluation nationwide, nationwide. We have this standard. So when I'm communicating with Dr. Chris Greely down at Children's Hospital in Texas, when I say I have this then he knows that [is] the criteria that I'm using. So for individuals that do this on a regular basis, there's no rule to it because as a physician you can choose to do what you want to do, but it's basically a practice standard for those of us that are professionals in this field.

Defense counsel called three witnesses on Harbison's behalf. The first was Harbison's probation officer, who testified that Harbison was in jail during a three-month period covered by the information. The second was Harbison's mother, who was also TH's

grandmother. She testified that Harbison quit school in the eighth grade, did not have a driver's license, and that he was never left alone with TH at her house. She testified that TH only came to her house once in a while and was not there very often. On cross-examination, she admitted that Harbison did babysit for TH's mother, and she admitted that she didn't know if any other adults were present during those times. The third witness was Harbison's live-in girlfriend, with whom he had three children by the time of trial. She testified that she and Harbison were always together, that he almost never went anywhere without her, and that she knew he was never alone with TH when he babysat for TH's mother, because she (his girlfriend) went with him on all those occasions and stayed with him no matter which room he went into, including the bathroom, where they would talk.

After approximately six hours of deliberation over two days, during which the jury asked that TH's testimony be replayed, Harbison was found guilty as charged on all counts. The trial court subsequently denied Harbison's motion for a new trial.

Harbison filed an appeal as of right along with a motion to remand for an evidentiary hearing on his claims that he was denied the effective assistance of counsel. Specifically, Harbison argued that his trial counsel failed to timely convey to him a plea offer and failed to present evidence that TH had previously made prior false accusations of sexual abuse. Harbison also argued that he was denied a fair trial because of Dr. Simms's testimony that TH had been sexually abused.

The Court of Appeals, while retaining jurisdiction, granted Harbison's motion to remand, directing the trial court to conduct a *Ginther*[13] hearing on Harbison's claims of ineffective assistance of counsel and to rule again on his motion for a new trial.[14] Following a lengthy hearing, the trial court granted a new trial on the ground that trial counsel was ineffective in failing to investigate and present testimony from TH's brother. The brother testified at the evidentiary hearing that he never witnessed Harbison try to have sexual contact with TH, contrary to TH's testimony at trial that her brother was present in the room at their grandmother's house when Harbison had sexual contact with her.

But the Court of Appeals reversed the trial court's grant of a new trial and affirmed Harbison's convictions in an unpublished per curiam opinion.[15] Judge KRAUSE concurred in the result only but did not provide an explanation. The panel concluded that defense counsel was not ineffective because TH's brother had credibility problems and, therefore, his testimony would not likely have made a difference at trial.[16] Regarding Dr. Simms's diagnosis of "probable pediatric sexual abuse," the panel held that the admission of this testimony was not plain error because "it appears that Dr. Simms was simply leaning

---

[13] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[14] *People v Harbison*, unpublished order of the Court of Appeals, entered April 25, 2016 (Docket No. 326105).

[15] *People v Harbison*, unpublished per curiam opinion of the Court of Appeals, issued January 26, 2017 (Docket No. 326105).

[16] *Id*. at 5-6.

16

toward taking [TH] at her word."[17] Under these circumstances, the panel held that this was not a clear and obvious error and that even if it was, the panel could not find the requisite prejudice because "the testimony, read as a whole, made clear that the physician was simply relying on [TH]'s word, and [TH] herself testified at trial."[18]

Harbison sought leave to appeal in this Court. This Court, in lieu of granting leave to appeal, vacated "that part of the Court of Appeals judgment concerning the testimony of Dr. N. Debra Simms" and remanded "to that court for reconsideration in light of *People v Peterson*, 450 Mich 349 (1995)."[19] Leave to appeal was denied in all other respects.

On remand, the Court of Appeals held that it "cannot find a clear or obvious error . . . with regard to Dr. Simms's testimony, even when viewed through the lens of *Peterson*."[20] Specifically, the panel held:

> Dr. Simms never directly opined on the ultimate question in this case—i.e., whether the victim was abused by defendant—she merely stated a medical diagnosis based on established diagnostic criteria, *all of which were explained to the jury*. Moreover, she never stated that she personally, or as an expert, found the victim's account of the abuse to be credible. Rather, she indicated that the victim had provided a history that was "clear, consistent, detailed *or* descriptive[.]" (Emphasis added.) Viewed in context, the testimony did not clearly run afoul of *Peterson's* admonishment that an

---

[17] *Id*. at 7.

[18] *Id*.

[19] *People v Harbison*, 501 Mich 897, 897 (2017).

[20] *People v Harbison (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued January 23, 2018 (Docket No. 326105), p 9.

17

expert may not vouch for the veracity of the victim or testify that the sexual abuse occurred or that the defendant is guilty.[21]

Harbison again sought leave to appeal in this Court. We directed the Clerk of this Court to schedule oral argument on whether to grant the application or take other action, ordering the parties to address the following issues: "whether the prosecution's admission of Dr. N. Debra Simms's expert testimony that the victim suffered 'probable pediatric sexual abuse' violated this Court's decision in [*Peterson*], and, if so, whether this was plain error requiring reversal of [Harbison's] convictions."[22]

### III. DETERMINATION OF APPLICABLE STANDARDS OF REVIEW

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion.[23] The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls " 'outside the range of principled outcomes.' "[24] A decision on a close evidentiary question ordinarily cannot be an abuse of discretion.[25]

---

[21] *Id*. at 8.

[22] *People v Harbison*, 501 Mich 1074, 1074 (2018).

[23] *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998).

[24] *People v Douglas*, 496 Mich 557, 565; 852 NW2d 587 (2014), quoting *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013).

[25] *People v Sabin (After Remand)*, 463 Mich 43, 67; 614 NW2d 888 (2000).

To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal.[26]

Preserved nonconstitutional errors are subject to harmless-error review under MCL 769.26, which states:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has *resulted in* a *miscarriage of justice*.[27]

In sum, if the issue is preserved, the defendant has the burden of establishing a miscarriage of justice under a "more probable than not" standard.[28] If the constitutional or nonconstitutional error is not preserved, the defendant must show a plain error that affected substantial rights.[29] The reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.[30]

---

[26] MRE 103(a)(1).

[27] Emphasis added.

[28] *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

[29] *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

[30] *Id*. at 763-764.

In *Harbison*, defense counsel did not object to Dr. Simms's testimony that TH suffered "probable pediatric sexual abuse." Accordingly, we review Harbison's claim under the plain-error standard.

In *Thorpe*, defense counsel objected to Cottrell's testimony that children only lie about sexual abuse 2% to 4% of the time.[31] The trial court overruled the objection, concluding that defense counsel had raised the issue of children lying on cross-examination and, thus, opened the door to the prosecution's line of questioning on redirect examination.

We conclude that defense counsel's objection was sufficient to preserve Thorpe's nonconstitutional claim that Cottrell's expert testimony should not have been admitted.[32] "Opening the door is one thing. But what comes through the door is another."[33] "[T]he test of whether rebuttal evidence was properly admitted is . . . whether the evidence is

---

[31] Immediately following the prosecutor's improper question on redirect, defense counsel stated: "I am going to object, unless there are statistics. If we have a summary or some sort of report statistics in it."

[32] Defense counsel's objection largely tracks this Court's opinion in *Peterson*, in which this Court highlighted both relevancy and reliability concerns with expert testimony about the rate of false reports of sexual abuse by children. *Peterson*, 450 Mich at 376. And here, even Cottrell acknowledged that there was literature on the topic of fabricated disclosures but that such literature was "extremely variable." Yet Cottrell did not base his opinion on the literature or any other scientific source. Cottrell based his testimony entirely on his experience working with people who were *self-reported* victims of sexual assault. Mental health professionals "are not . . . experts at discerning truth. [They] are trained to accept facts provided by their patients, not to act as judges of patients' credibility." *People v Beckley*, 434 Mich 691, 728; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.) (quotation marks and citation omitted).

[33] *United States v Winston*, 447 F2d 1236, 1240 (CA DC, 1971) (quotation marks and citation omitted).

20

properly responsive to evidence introduced or a theory developed by the defendant."[34] Defense counsel did not open the door to Cottrell's testimony regarding the rate of false reports in child sexual abuse cases simply by asking him on cross-examination whether children lie or manipulate. Counsel did not ask Cottrell about the frequency with which children lie, whether children make false allegations of sexual abuse, or whether he has had any experience with false accusations in his own practice. We agree with Thorpe that defense counsel's questions to Cottrell—"let me ask you this, kids can lie, true?" and "[a]nd they can manipulate[?]"—were discrete, straightforward, and uncontroversial questions of fact. To maintain that these basic questions *invited* the prosecution to elicit expert testimony from Cottrell that children lie about sexual abuse 2% to 4% of the time would essentially require defense counsel to read tea leaves before asking any questions. We therefore conclude that Thorpe's claim is preserved and that he has the burden of establishing a miscarriage of justice under a "more probable than not" standard to establish error requiring reversal.

## IV. LEGAL BACKGROUND

Three cases decided by this Court control the analysis of the instant cases. In *People v Smith*,[35] we addressed "whether the trial courts erred so as to require reversal in allowing the examining physicians to testify that the complainants had been sexually assaulted."[36]

---

[34] *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996).

[35] *People v Smith*, 425 Mich 98; 387 NW2d 814 (1986).

[36] *Id*. at 101.

21

Citing MRE 704, we stated that "[i]t is . . . well-established that expert opinion testimony will not be excluded simply because it concerns the ultimate issue[.]"[37]  Yet, we acknowledged that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the "conclusion [is] nothing more than the doctor's opinion that the victim had told the truth."[38]  An examining physician's opinion is objectionable when it is solely based "on what the victim . . . told" the physician.[39]  Such testimony is not permissible because a "jury [is] in just as good a position to evaluate the victim's testimony as" the doctor.[40]  Nonetheless, an examining physician, if qualified by experience and training relative to treatment of sexual assault complainants, can opine with respect to whether a complainant had been sexually assaulted when the opinion is based on physical findings *and* the complainant's medical history.[41]

Smith only addressed the expert testimony of the examining physician; *Smith* declined to address expert psychiatric testimony or evidence of rape trauma syndrome:

> Our decision today is made in the context of the particular cases before us, i.e., both cases concerned admissibility of the doctors' opinions which were based on examination of the alleged victims shortly after the incidents. We express no opinion on, e.g., the admissibility of expert psychiatric

---

[37] *Id*. at 106.

[38] *Id*. at 109.

[39] *Id*.

[40] *Id*.

[41] *Id*. at 110-112.

testimony or rape trauma syndrome evidence, noting only that the rules of evidence should guide any decision on admissibility of expert testimony.[42]

Some four years later, however, we addressed that question in this Court's plurality opinion in *People v Beckley*.[43]  In the lead opinion authored by Justice BRICKLEY, joined by Justices GRIFFIN and LEVIN, the Court acknowledged that " 'syndrome' evidence as it relates to child abuse cases is a relatively new development in the law and novel to our Court . . . ."[44]  As one article explains:

> Prosecution of offenders for child sexual abuse is often difficult because of the sparsity of witnesses to these crimes.  As such, expert testimony is sometimes used at trial to explain some of the commonly misunderstood behaviors exhibited by children who have been victims of sexual abuse, such as delayed reporting and recantation.  In the behavioral science field, there exists a syndrome labeled the child sexual abuse accommodation syndrome (CSAAS).[45]

The lead opinion noted, however, that this evidence is problematic:

> [T]he evidence has a very limited use and should be admitted cautiously because of the danger of permitting an inference that as a result of certain behavior sexual abuse in fact occurred, when evidence of the syndrome is not a conclusive finding of abuse.  Although syndrome evidence may be appropriate as a tool for purposes of treatment, we would hold that it is unreliable as an indicator of sexual abuse.[46]

---

[42] *Id*. at 115 n 13.

[43] *People v Beckley*, 434 Mich 691; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.).

[44] *Id*. at 706.

[45] 85 ALR5th 595, 595.

[46] *Beckley*, 434 Mich at 724 (opinion by BRICKLEY, J.).

23

The lead opinion looked to foreign jurisdictions and recognized a clear divide on the use of such evidence. On one hand, some courts have allowed the use of the syndrome evidence generally and even have allowed the expert to opine that he found the victim's account " 'believable.' "[47] On the other hand, the lead opinion recognized that some courts take an "approach where testimony is allowed only on specific behavioral instances to which the defendant has opened the door in an attempt to discredit the victim's testimony. This . . . approach permits syndrome testimony only with respect to the specific characteristics that the defendant has attacked."[48]

The lead opinion also recognized "a middle ground [that] allows the expert to testify in general terms as to any and all behavior patterns that are seemingly inconsistent with crime victims generally."[49] After reviewing this caselaw, the lead opinion observed that evidence of behavioral patterns of sexually abused children may be admissible "for the narrow purpose of rebutting an inference that a complainant's postincident behavior was inconsistent with that of an actual victim of sexual abuse, incest or rape."[50]

---

[47] *Id*. at 708, quoting *State v Kim*, 64 Hawaii 598, 601; 645 P2d 1330 (1982).

[48] *Beckley*, 434 Mich at 708-709 (opinion by BRICKLEY, J.). See, e.g., *People v Bowker*, 203 Cal App 3d 385; 249 Cal Rptr 886 (1988).

[49] *Beckley*, 434 Mich at 710 (opinion by BRICKLEY, J.), citing *State v Hall*, 406 NW2d 503 (Minn, 1987).

[50] *Beckley*, 434 Mich at 710 (opinion by BRICKLEY, J.) (quotation marks and citation omitted). Justice BOYLE, joined by Chief Justice RILEY, concurred and wrote separately to express concern that "the rationale employed in the lead opinion may create restrictions on the use of expert testimony in child sexual abuse cases that unnecessarily limit an expert's ability to assist the factfinder." *Id*. at 734 (opinion by BOYLE, J.). Basically, Justice BOYLE agreed with the "numerous jurisdictions [that] allow the use of expert

24

Five years later, the Court found a majority to "clarify [the plurality] decision in *Beckley*" and held:

(1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility.[51]

Applying this framework, the Court identified the errors associated with the experts' testimony in *Peterson*. "First, the experts . . . improperly vouched for the veracity of the child victim" by "testify[ing] that children lie about sexual abuse at a rate of about two percent."[52]

Second, the experts in *Peterson* were allowed to make numerous references to the consistencies between the victim's behavior and the behavior of typical victims of child sexual abuse. The experts, in various

---

testimony to assist the jury in evaluating credibility, without reference to rehabilitation or rebuttal." *Id*. at 736-737. Justice ARCHER, joined by Justice CAVANAGH, concurred in part and dissented in part. Justice ARCHER disagreed that an expert should be permitted to refer to the complainant in a particular case. He would have limited the expert's testimony to a discussion of the specific postincident behavioral traits at issue, without reference to a complainant or the specific facts of a case. *Id*. at 744-745 (ARCHER, J., concurring in part and dissenting in part). Justice ARCHER opined that "[u]nder the rule the lead opinion would adopt today, the danger is too great that the trier of fact will improperly infer that an expert testifying on the basis of syndrome evidence is, in effect, concluding that the particular complainant before the court has been abused." *Id*. at 747.

[51] *Peterson*, 450 Mich at 352-353.

[52] *Id*. at 375-376.

ways, testified regarding the dysfunctional family that each had observed and about some of the bizarre behavior exhibited by the victim.[53]

The Court concluded that "[b]ecause the defendant never argued that the victim's behavior was inconsistent with that of a typical victim of child sexual abuse, such testimony is error."[54]

## V. APPLICATION

## A. THORPE

We conclude that Thorpe has shown that it is more probable than not that a different outcome would have resulted without Cottrell's testimony that children lie about sexual abuse 2% to 4% of the time. In *Peterson*, this Court observed that nearly identical testimony allowed "the experts in that case [to] improperly vouch[] for the veracity of the child victim."[55] Here, not only did Cottrell opine that only 2% to 4% of children lie about sexual abuse, but he also identified only two specific scenarios in his experience when children might lie, neither of which applies in this case. As a result, although he did not actually say it, one might reasonably conclude on the basis of Cottrell's testimony that there was a 0% chance BG had lied about sexual abuse. In so doing, Cottrell for all intents and purposes vouched for BG's credibility. Furthermore, the prosecution's closing argument on rebuttal highlighted this improper evidence at a pivotal juncture at trial:

---

[53] *Id*. at 376.

[54] *Id*. at 376-377.

[55] *Peterson*, 450 Mich at 375-376. *Peterson* also stated that "[s]uch references to truthfulness . . . go beyond that which is allowed under MRE 702." *Id*. at 376. Although we have no sound basis to dispute the Court's statement, we need not reach this unpreserved issue.

26

The defense attorney asked you, why would [BG] lie? It's a very good question. You need to think about that, because she did not. Mr. Cottrell did say that it's very rare for children to lie. His percentage was less than two to four percent of all of those cases that his agency sees.

But he said one of the reasons they don't [lie] is because there is no gain for the victim. What [did BG] get out of this? She didn't get [sic] attorney. She had to go to a forensic interview. She had to testify at a prelim, she had to testify here at trial. There is no gain for any of that. She had to talk about this a lot, about what happened to her.

Thorpe's trial was a true credibility contest. There was no physical evidence, there were no witnesses to the alleged assaults, and there were no inculpatory statements. The prosecution's case consisted of BG's allegations, testimony by her mother regarding BG's disclosure of the alleged abuse and behavior throughout the summer and fall of 2012, and Cottrell's expert testimony. Thorpe testified in his own defense and denied the allegations. Additionally, Kimberly testified about other reasons for BG's behavior during the summer and fall of 2012; namely, that her mother had started a new relationship and become pregnant and that Thorpe had decided to no longer have parenting time with BG. Because the trial turned on the jury's assessment of BG's credibility, the improperly admitted testimony wherein Cottrell vouched for BG's credibility likely affected the jury's ultimate decision. Under these circumstances, we conclude that Thorpe has shown that it is more probable than not that a different outcome would have resulted without Cottrell's improper testimony.

## B. HARBISON

We conclude that Harbison has established a plain error that affected his substantial rights. Dr. Simms's expert opinion that TH suffered "probable pediatric sexual abuse" is contrary to this Court's unanimous decision in *Smith*. In *Smith*, the examining physician

27

"testified that although he found no physical evidence of an assault, in his opinion [the] complainant had been sexually assaulted. This opinion was based on the complainant's emotional state, described by [the expert] as 'agitated, extremely nervous' and 'shaking,' and her 'history as she described it . . . .' "[56] This Court readily concluded that the expert testimony was improperly admitted. This Court observed that the expert's "opinion that the complainant had been sexually assaulted was based, not on any findings within the realm of his medical capabilities or expertise as an obstetrician/gynecologist, but, rather, on the emotional state of, and the history given by, the complainant."[57]

In *Harbison*, Dr. Simms candidly acknowledged that her examination of TH showed no physical evidence of an assault. Her conclusion that TH suffered "probable pediatric sexual abuse" was based solely on her own opinion that TH's account of the assaults was

---

[56] *Smith*, 425 Mich at 102-103.

[57] *Id*. at 112. In contrast, in *Smith*'s companion case, *People v Mays*, the examining physician testified that "his examination revealed a red mark on [the victim's] face and she had some small abrasions at the entrance of her vagina." *Id*. at 104. The prosecution asked:

> "*Q*. [*Prosecuting Attorney*]: All right. Using your background, your education, your experience, her demeanor, her clothing, her attitude, and what you saw in your examination, all of the things that you know about this person, using all of your experience, did you form an opinion as to whether or not there was sexual penetration against her will?" [*Id*. (alteration in original).]

The expert answered, " 'My opinion was that she had been penetrated against her will.' " *Id*. at 105. The Court found that the admissibility of the expert's testimony presented a "closer question." *Id*. at 113. The Court concluded that the expert provided some objective evidence (abrasions at the entrance of the complainant's vagina) that was not consistent with consensual relations and held that given the victim's emotional state and the expert's experience in treating similar patients, the testimony was admissible.

28

"clear, consistent, detailed and descriptive." This testimony clearly falls within *Smith*'s holding that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the "conclusion [is] nothing more than the doctor's opinion that the victim had told the truth."[58] An examining physician's opinion is objectionable when it is solely based "on what the victim . . . told" the physician.[59] Such testimony is not permissible because a "jury [is] in just as good a position to evaluate the victim's testimony as" the doctor.[60]

We also conclude that this error was plain, i.e., obvious. Our decision in *Smith* was unanimous and has never been called into question. *Smith* provides a very straightforward bright-line test that trial courts can readily observe. Other than the instant case, every Court of Appeals panel that has considered an examining physician's diagnosis of "probable pediatric sexual abuse" has acknowledged that the admission of this testimony is error.[61]

---

[58] *Smith*, 425 Mich at 109.

[59] *Id.*

[60] *Id.*

[61] *People v Jackson*, unpublished per curiam opinion of the Court of Appeals, issued April 29, 2010 (Docket No. 283092), p 2; *People v Gresham*, unpublished per curiam opinion of the Court of Appeals, issued December 7, 2010 (Docket No. 293580), pp 2-3; *People v Spayde*, unpublished per curiam opinion of the Court of Appeals, issued September 29, 2011 (Docket No. 294300), pp 3-4; *People v Gillen*, unpublished per curiam opinion of the Court of Appeals, issued May 15, 2012 (Docket No. 304350), p 3; *People v Chevis*, unpublished per curiam opinion of the Court of Appeals, issued October 8, 2013 (Docket No. 304358), p 8; *People v Bentz*, unpublished per curiam opinion of the Court of Appeals, issued December 29, 2016 (Docket No. 329016), p 3.

We also conclude that Dr. Simms's testimony that TH suffered "probable pediatric sexual abuse" affected defendant's substantial rights. *Smith* focused on the lack of reliability of an expert opinion given the lack of physical findings and the superfluous nature of an expert's testimony in cases in which the "jury was in just as good a position to evaluate the victim's testimony . . . ."[62] But we believe the most prejudicial aspect of Dr. Simms's testimony was that she clearly vouched for TH's credibility. This Court has previously drawn a distinction between expert testimony that a particular child was abused and testimony about the common characteristics of abused children:

> Therefore, any testimony about the truthfulness of this victim's allegations against the defendant would be improper because its underlying purpose would be to enhance the credibility of the witness. To hold otherwise would allow the expert to be seen not only as possessing specialized knowledge in terms of behavioral characteristics generally associated with the class of victims, but to possess some specialized knowledge for discerning the truth.[63]

As we recognized in *Beckley* and embraced in *Peterson*:

> The use of expert testimony in the prosecution of criminal sexual conduct cases is not an ordinary situation. Given the nature of the offense and the terrible consequences of a miscalculation—the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented—appropriate safeguards are necessary. To a jury recognizing the awesome dilemma of whom to believe, an expert will often

---

[62] *Smith*, 425 Mich at 109.

[63] *Beckley*, 434 Mich at 727-728, 729 (opinion by BRICKLEY, J.).

represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat.[64]

In *Harbison*, the Court of Appeals found no error in Dr. Simms's testimony, reasoning that Dr. Simms did not opine on whether the complainant was abused by Harbison but only diagnosed the complainant with "probable pediatric sexual abuse." We disagree. Regardless of whether "probable pediatric sexual abuse" is a term of art that can be used as a diagnosis with or without physical findings, we conclude that Dr. Simms's testimony had the clear impact of improperly vouching for TH's credibility.

And much like *Thorpe*, the instant case is largely a credibility contest. The only evidence against Harbison was TH's uncorroborated testimony. To bolster its case, the prosecution presented testimony from a pediatrician who is board-certified in child abuse pediatrics; who is currently a medical director at the Safe Harbor Children's Advocacy Center; who has examined, in her estimate, thousands of children that have been sexually abused; and who has testified as an expert witnesses in 32 counties. Given the lack of compelling testimony that forms the basis for the verdict and the plainly erroneous testimony that TH suffered "probable pediatric sexual abuse," we conclude that the plain error affected Harbison's substantial rights.

We also conclude that this error is far more pernicious than a mere evidentiary error. Rather, this error strikes at the heart of several important principles underlying our rules of evidence. Dr. Simms's testimony that TH suffered "probable pediatric sexual abuse" based solely on TH's statements about her history not only had the effect of vouching for TH's

---

[64] *Id*. at 721-722.

credibility, but it also invaded the province of the jury to determine the only issue in the case. Then, Dr. Simms reinforced this plain error by claiming that her diagnosis was based on a "national [consensus]" of pediatricians when even a cursory review of the article on which she relies reveals that the authors did not intend for pediatricians to rely on the article to make a diagnosis of "probable pediatric sexual abuse" at trial.[65]   This improperly

---

[65] Moreover, to the extent that Dr. Simms relied on the article *Examination Findings in Legally Confirmed Child Sexual Abuse: It's Normal to be Normal* to conclude that TH suffered "probable pediatric sexual abuse," that reliance was seriously misplaced.  Adams, Harper, Knudson & Revilla, *Examination Findings in Legally Confirmed Child Sexual Abuse: It's Normal to be Normal*, 94 Pediatrics 310 (1994).  Relying on this article to testify at trial concerning whether a complainant suffered "probable pediatric sexual abuse" actually undermines the integrity of the study by proving the very premise that it accepts as true, i.e., that legally confirmed convictions are a valid measure of the truth.  The article admits as much by acknowledging that "since the examiner testified in court in 34 of the cases in which the perpetrator was convicted following a jury trial, it is possible that *testimony concerning medical findings contributed to the conviction*."  *Id*. at 315 (emphasis added).  Given that the article notes that it "is possible that testimony concerning medical findings contributed to the conviction," it seems likely that testimony concerning a "diagnosis" would further contribute to the conviction, especially, as in this case, when there are no physical findings to be found.  *Id*.  In many respects, relying on the article in this manner is akin to offering into evidence conviction rates to establish that those charged with crimes will "probably" be convicted.

We conclude that the article is clearly directed toward making a "diagnosis" on the basis of " 'proof' *before* proceeding with criminal charges" and does not support a "diagnosis" of pediatric sexual abuse at trial.  *Id*. at 317 (emphasis added).  The article only once refers to the term "diagnosis" and only does so by placing the term in scare quotes, which are "used to express esp. skepticism or derision concerning the use of the enclosed word or phrase."  *Merriam-Webster's Collegiate Dictionary* (11th ed).  In other words, the term "diagnosis" is not being used in its traditional sense.  This makes sense, as even Dr. Simms herself explained that the purpose of the "diagnosis" was "to allow pediatricians that do child abuse evaluations to communicate with one another effectively . . . ."

Rather, the article is directed at pediatricians who must make referrals of possible sexual abuse and to inform prosecutors that the absence of medical "findings" does not mean that the complainant did not suffer sexual abuse.  This reading of the article not only

admitted testimony very likely bolstered TH's credibility and affected the verdict. We conclude that the gravity of this significant error seriously affected the integrity of Harbison's trial.

## VI. CONCLUSION

In *Thorpe*, we reverse the judgment of the Court of Appeals and remand to the Allegan Circuit Court for a new trial. In *Harbison*, we reverse the judgment of the Court of Appeals and remand to the Allegan Circuit Court for a new trial.

Brian K. Zahra
Bridget M. McCormack
Stephen J. Markman
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

---

makes sense but is consistent with Michigan law and likely the law of every other state. Indeed, the Michigan Legislature set a very low bar for triggering a report of sexual abuse, requiring a report if one only "has reasonable cause to suspect child abuse or child neglect . . . ." MCL 722.623(1)(a). And even if, as Dr. Simms testified and the Court of Appeals highlighted, "probable pediatric sexual abuse" is "a term of art used by 'individuals that do pediatric sexual abuse evaluation nationwide,' " there is good reason why a search of the caselaw of every other state reveals no matches for the phrase "probable pediatric sexual abuse" yet a search of our own caselaw reveals the phrase used in several unpublished Court of Appeals opinions.